DAN RHYNE AND ALICE RHYNE v. K-MART CORPORATION, SHAWN ROBERTS, AND JOSEPH HOYLE

No. COA00-1516

(Filed 16 April 2002)

**1. Constitutional Law; Damages and Remedies— statute capping award of punitive damages—right to jury trial—separation of powers—open courts guarantee—special legislation—due process—equal protection—vagueness**

The trial court did not err by reducing the jury's award of punitive damages to plaintiffs from $11.5 million each to $250,000 each in accordance with the cap, or limit, on the award of punitive damages under N.C.G.S. § 1D-25 and by refusing to declare the statute unconstitutional, because: (1) the statute does not violate the right to a jury trial under N.C. Const. Art. I, § 25 since jury trials are not constitutionally required in a wide range of civil cases that do not "respect" property including punitive damages; (2) the statute does not violate the principle of separation of powers by allegedly exercising the power of remittitur since a punitive damages cap and remittitur are not the same and operate under differing circumstances; (3) the open courts guarantee is not violated since actual damages are not limited; (4) the statute does not constitute special legislation, and it does not violate N.C. Const. Art. II, § 24, c1.(1)(i) or N.C. Const. Art. I, § 32; (5) the statute does not violate due process and equal protection since there can be no taking of property by placing a cap on punitive damages and no infringement on the right to enjoy the fruits of one's own labor, and plaintiffs cannot carry their burden of showing the statute bears no rational relationship to any legitimate government interest; and (6) the statute is not unconstitutionally vague since the statute provides sufficient language for uniform judicial administration.

**2. Damages and Remedies— punitive damages—per plaintiff rather than per claim basis**

The trial court did not err by capping punitive damages on a per plaintiff rather than a per claim basis, because: (1) N.C.G.S. § 1D-25 limits punitive damages to no more than three times the compensatory damages awarded or $250,000, whichever is greater, and all compensatory damages awarded to a party must therefore be totaled to one number for consideration of the cap;

(2) a per claim basis would improperly allow duplicate credit for one compensatory award; and (3) the language of the statute speaks to a single award for each plaintiff.

### 3. Damages and Remedies— punitive damages—award not excessive

The trial court did not err by determining the modified jury award of punitive damages of $250,000 was not excessive, because: (1) the ratio of actual harm to the award is approximately 30 to 1 for plaintiff husband and 23 to 1 for plaintiff wife; (2) the actions of defendant individuals were violent; (3) defendant corporation accused plaintiffs of trespassing and instituted assault charges against plaintiff husband in order to keep plaintiffs from taking out criminal charges against defendant corporation; and (4) plaintiffs suffered both physical and psychological problems as a result, and plaintiff wife now has a permanent heart condition that is arguably traceable to the incident at issue.

### 4. Costs— attorney fees—punitive damages case

The trial court did not err in an action seeking punitive damages by denying attorney fees under N.C.G.S. § 1D-45, because: (1) although plaintiffs discuss how defendant corporation engaged in malicious acts or practices as a corporation, plaintiffs fail to establish how defendant's defense may have been malicious or frivolous; and (2) plaintiffs failed to show an abuse of discretion by the trial court under these circumstances.

### 5. Appeal and Error— preservation of issues—failure to object

Although defendant corporation contends the trial court erred in an action seeking punitive damages by concluding that defendant corporation is not entitled to a new trial based on plaintiffs' introduction of evidence of defendant's discovery misconduct, defendant failed to preserve this issue for appeal because: (1) defense counsel never specifically objected to the inclusion of evidence demonstrating defendant corporation's misconduct during discovery on the grounds now argued; and (2) a party in a civil case may not raise an issue on appeal that was not raised at the trial level.

Judge GREENE concurring in part and dissenting in part.

RHYNE v. K-MART CORP.

[149 N.C. App. 672 (2002)]

Appeal by plaintiffs and defendant K-Mart Corporation from judgment entered 17 May 2000 by Judge Richard D. Boner in Gaston County Superior Court. Heard in the Court of Appeals 16 October 2001.

*Robert S. Peck, Arcangela M. Mazzariello, and Gray, Layton, Kersh, Solomon, Sigmon, Furr & Smith, PA, by William E. Moore, Jr. for plaintiffs.*

*Alston & Bird, LLP, by Leigh M. Levine, James C. Grant (pro hac vice), and Nowell D. Berreth (pro hac vice), for defendant K-Mart.*

*Patterson, Harkavy & Lawrence, LLP, by Burton Craige for North Carolina Academy of Trial Lawyers, North Carolina Friends of Residents in Long Term Care, Inc., North Carolina Justice and Community Development Center, and American Civil Liberties Union Legal Foundation of North Carolina, Amici Curiae.*

*Smith, Anderson, Blount, Dorsey, Mitchell & Jernigan, LLP, by James Y. Kerr, II and Johanna S. Fowler; and Maupin, Taylor & Ellis, PA by Charles B. Neely, Jr. and Thomas Farr, for North Carolina Citizens for Business and Industry, Amicus Curiae.*

*Samuel M. Taylor and Daniel J. Popeo for Washington Legal Foundation and Allied Educational Foundation, Amici Curiae.*

*Smith, Helms, Mulliss & Moore, LLP, by J. Donald Cowan, Jr. and Lisa Frye Garrison, for Product Liability Advisory Council, Amicus Curiae.*

THOMAS, Judge.

The primary issue in this case is whether North Carolina's General Assembly exceeded its constitutional authority in enacting a cap, or limit, on the award of punitive damages.

North Carolina General Statute § 1D-25 became effective on 1 January 1996 and placed a cap on the amount of punitive damages that could be awarded at $250,000 or three times the compensatory damages, whichever is larger.

Here, plaintiffs Dan Rhyne (Mr. Rhyne) and Alice Rhyne (Mrs. Rhyne), husband and wife, received verdicts for compensatory damages in the amounts of $8,255 and $10,730, respectively, against

defendant K-Mart Corporation (K-Mart). The jury then awarded each of them $11.5 million in punitive damages. In accordance with its interpretation of section 1D-25, the trial court reduced the punitive damages awards to $250,000 per claimant.

Plaintiffs appeal. They contend section 1D-25 is unconstitutional under the North Carolina Constitution in that it: (1) violates their right to a jury trial; (2) violates the separation of powers principle; (3) violates the open courts guarantee; (4) constitutes an improper form of special legislation; (5) violates principles of due process, equal protection, and the right to enjoy the fruits of one's own labor; and (6) is void for vagueness.

We disagree with plaintiffs' contentions. Based on the reasoning herein, we hold the General Assembly acted within the bounds of the North Carolina Constitution and in accordance with its legislative prerogative.

Because section 1D-25 is constitutional, we also address three other issues raised by plaintiffs and K-Mart. They are: (a) whether the $250,000 cap is to be applied per claim, per plaintiff, or per defendant; (b) whether the trial court erred in denying plaintiffs' request for attorney fees; and (c) whether K-Mart is entitled to a new trial.

The pertinent facts are as follows: On 28 April 1998, plaintiffs were walking near a store owned by K-Mart. Defendants Shawn Roberts (Roberts) and Joseph Hoyle (Hoyle), employees of K-Mart, confronted plaintiffs and asked if they had been rummaging through K-Mart's dumpsters. Plaintiffs explained they were merely walking for exercise and had not touched the dumpsters.

The next day, plaintiffs were again walking in the K-Mart parking lot when Roberts and Hoyle approached them. Roberts grabbed Mr. Rhyne, put him in a chokehold and forced him to his knees. Mrs. Rhyne screamed and jumped on Roberts's back. He shook her off, resulting in her falling to the ground. When she tried to help her husband again, Hoyle intervened and pushed her back to the ground.

Shortly thereafter, two police officers arrived. Plaintiffs told the officers they wanted to press criminal charges against Roberts and Hoyle. Meanwhile, Roberts and Hoyle told the police they had seen plaintiffs going through K-Mart's dumpsters and that plaintiffs were guilty of theft and trespass. Roberts and Hoyle subsequently admitted, however, that they had only heard a noise near the dumpsters and

RHYNE v. K-MART CORP.

[149 N.C. App. 672 (2002)]

assumed it must have been plaintiffs. Nonetheless, K-Mart took out two assault warrants against Mr. Rhyne. The charges were dismissed on 10 June 1998.

Following the altercation, plaintiffs sought medical attention for resulting physical injuries and psychiatric problems. They were diagnosed with adjustment disorders, prescribed medication, and advised to obtain counseling. Mrs. Rhyne also suffered a heart attack. According to expert testimony, the altercation and subsequent events contributed to her heart condition, but the relationship was "unquantifiable." Mrs. Rhyne's medical bills totaled $13,582.40, which included $11,349.50 for treatment of her heart attack. Mr. Rhyne's medical bills and lost wages amounted to $5,376.12.

Plaintiffs filed a complaint against K-Mart, Roberts and Hoyle on 31 December 1998, alleging assault, false imprisonment, battery, malicious prosecution, and intentional infliction of emotional distress. In addition, plaintiffs claimed K-Mart was negligent in the training and supervision of its security personnel. In their prayer for relief, plaintiffs asked for compensatory and punitive damages.

Pursuant to N.C. Gen. Stat. § 1D-30, the trial was bifurcated into compensatory and punitive damages stages. In the compensatory stage, Hoyle was found not liable and, although the jury determined Roberts to be liable, the trial court granted plaintiffs' motion to dismiss with prejudice all claims for damages against him. Plaintiffs did receive a favorable verdict against K-Mart, however, with the jury awarding $8,255 to Mr. Rhyne and $10,730 to Mrs. Rhyne. In the punitive damages stage, with plaintiffs proceeding only against K-Mart, the jury returned a verdict of $11.5 million for each plaintiff. Citing N.C. Gen. Stat. § 1D-25(b), the trial court reduced each punitive damages award to $250,000. Upon plaintiffs' motions, the trial court denied their requests to have the statute declared unconstitutional and for attorney fees. Both plaintiffs and K-Mart appeal.

Plaintiffs' assignments of error include: (a) the trial court's refusal to declare section 1D-25 unconstitutional; (b) the capping of punitive damages on a per plaintiff rather than a per claim basis; and (c) the denial of attorney fees. In its cross-appeal, K-Mart requests a new trial based on its claim that the trial court prejudicially erred during the punitive damages stage in allowing evidence of its discovery misconduct. In the alternative, K-Mart argues the trial court should have applied the punitive damages cap on a per defendant basis with plaintiffs splitting the $250,000.

RHYNE v. K-MART CORP.

[149 N.C. App. 672 (2002)]

## I. The Constitutionality of Section 1D-25

[1] In their first assignment of error, plaintiffs contend section 1D-25 is unconstitutional because it: (1) violates their right to a jury trial; (2) violates the separation of powers principle; (3) violates the open courts guarantee; (4) constitutes an improper form of special legislation; (5) violates principles of due process, equal protection, and the right to enjoy the fruits of one's own labor; and (6) is void for vagueness.

Section 1D-25 provides:

(a) In all actions seeking an award of punitive damages, the trier of fact shall determine the amount of punitive damages separately from the amount of compensation for all other damages.

(b) Punitive damages awarded against a defendant shall not exceed three times the amount of compensatory damages or two hundred fifty thousand dollars ($250,000), whichever is greater. If a trier of fact returns a verdict for punitive damages in excess of the maximum amount specified under this subsection, the trial court shall reduce the award and enter judgment for punitive damages in the maximum amount.

(c) The provisions of subsection (b) of this section shall not be made known to the trier of fact through any means, including voir dire, the introduction into evidence, argument, or instructions to the jury.

N.C. Gen. Stat. § 1D-25 (1999). Plaintiffs' argument is based only on the North Carolina Constitution and thus does not invite federal case law scrutiny by implicating the United States Constitution.

### A. Jury Trial

Plaintiffs first contend section 1D-25 is unconstitutional because it violates their right to a jury trial pursuant to Art. I, § 25, which provides: "In all controversies at law respecting property, the ancient mode of trial by jury is one of the best securities of the rights of the people, and shall remain sacred and inviolable." N.C. Const. Art. I, § 25.

Our Supreme Court has held that the right to a jury trial under Art. I, § 25 of the North Carolina Constitution applies *only:* (1) where the right to a jury trial existed at common law or by statute at the time

of the adoption of the 1868 Constitution; and (2) when the cause of action "respects property." *State ex rel. Rhodes v. Simpson*, 325 N.C. 514, 385 S.E.2d 329 (1989), *rev'd on other grounds*, 333 N.C. 81, 423 S.E.2d 759 (1992). For a cause of action originating after 1868, the right to a jury trial is contingent upon statutory authority. *Id.* (citing *Groves v. Ware*, 182 N.C. 553, 558, 109 S.E. 568, 571 (1921)).

Punitive damages were determined by juries prior to 1868. *See Gilreath v. Allen*, 32 N.C. 67, 69 (1849). The first part of the test is therefore satisfied, so we proceed to the second. The distinction between causes of action respecting property and those respecting other rights is fundamental and well-established. In *Smith v. Campbell*, 10 N.C. 595, (1825), our Supreme Court held that:

> Property is a thing over which a man may have dominion and power to do with it as he pleases, so that he violates not the law. He may give, grant, or sell it at his pleasure. A person has an *interest* in a *debt* or *duty*; but a *property* in a *thing* only, either natural or artificial. He cannot give or grant a debt or duty, because it is not property; not because, as some supposed, the law through policy will not permit a thing in action to be given or granted; it is because this thing in action is not property that it cannot be granted.

*Id.* at 597-98 (emphasis in original). The *Smith* court then held that the defendant was not entitled to a jury trial on the issue of nonpayment of a debt owned. *Id.*

Since *Smith*, North Carolina courts have held that jury trials are not constitutionally required in a wide range of civil cases that do not "respect" property. *See McCall v. McCall*, 138 N.C. App. 706, 531 S.E.2d 894 (2000) (equitable distribution proceedings); *State v. Morris*, 103 N.C. App. 246, 405 S.E.2d 351 (1991) (forfeiture proceedings); *In re Clark*, 303 N.C. 592, 281 S.E.2d 47 (1981) (child custody proceedings); *State v. Carlisle*, 285 N.C. 229, 204 S.E.2d 15 (1974) (driver's license revocation proceedings).

The purpose of punitive damages, as its nomenclature indicates, is to punish. The person aggrieved has the right to compensation for, *inter alia*, actions for pain and suffering, emotional distress, lost wages, medical bills, disability, and loss of consortium. The right to punish, meanwhile, properly resides with the State. Thus, no individual possesses the right to punitive damages as being that person's

property. *See Watson v. Dixon*, 130 N.C. App. 47, 502 S.E.2d 15 (1998), *aff'd*, 352 N.C. 343, 532 S.E.2d 175 (2000); *Lynch v. North Carolina Dept. of Justice*, 93 N.C. App. 57, 376 S.E.2d 247 (1989); *Hunt v. Hunt*, 86 N.C. App. 323, 357 S.E.2d 444, *aff'd*, 321 N.C. 294, 362 S.E.2d 161 (1987). As even the dissent in this case does not fully contest, the legislature has the power to abolish punitive damages. *See Osborn v. Leach*, 135 N.C. 628, 47 S.E. 811 (1904). The power to abolish punitive damages necessarily carries with it the power to limit the punishment. *See generally, Pulliam v. Coastal Emergency Services of Richmond, Inc.*, 509 S.E.2d 307, 314 (Va. 1999); *Bagley v. Shortt*, 410 S.E.2d 738 (Ga. 1991).

Accordingly, we reject plaintiffs' contention that punitive damages are within the definitional umbrella of "respecting property" and likewise do not agree with the dissent's analysis that such a requirement has been abolished.

## B. Separation of Powers

The North Carolina Constitution provides that "[t]he legislative, executive, and supreme judicial powers of the State government shall be forever separate and distinct from each other." N.C. Const. Art. I, § 6. Plaintiffs argue section 1D-25 is unconstitutional in that it violates the principle of separation of powers by exercising the power of remittitur.

Remittitur is "[t]he procedural process by which an excessive verdict of the jury is reduced." *Black's Law Dictionary* 1295 (6th ed. 1990). It is a judicial process. However, a punitive damages cap and remittitur are not the same. In *Pulliam v. Coastal Emergency Services of Richmond, Inc.*, the Virginia Supreme Court held that:

> remittitur and the [medical malpractice damages] cap are not equivalent and do not come into play under the same circumstances. Remittitur, as well as additur, is utilized only after a court has determined that a party has not received a fair and proper jury trial. The cap, however, is applied only after a plaintiff has had the benefit of a proper jury trial.

*Pulliam*, 257 Va. 1, 12, 509 S.E.2d 307, 313 (1999). Likewise, the statutes in North Carolina indicate that remittitur and the punitive damages cap operate under differing circumstances. While classic remittitur is not permitted in North Carolina, the concept is governed by Rule 59 of the North Carolina Rules of Civil Procedure in which a

new trial may be granted to a party for excessive or inadequate damages appearing to have been awarded under the influence of passion or prejudice. *See* N.C. Gen. Stat. § 1A-1, Rule 59(a)(6) (1999). Section 1D-25, on the other hand, requires the award to be limited after a proper jury trial. *See* N.C. Gen. Stat. § 1D-25 (1999).

Moreover, as aforementioned, the legislature has the power to abolish punitive damages entirely. *Osborn v. Leach,* 135 N.C. 628, 47 S.E. 811 (1904). Further, the legislature has the power to create, modify, or eliminate other common law remedies. *See* N.C. Gen. Stat. §§ 1-538, 1-539.21; *State ex rel. Lanier v. Vines,* 274 N.C. 486, 164 S.E.2d 161 (1968); *Gillikin v. Bell,* 254 N.C. 244, 118 S.E.2d 609 (1961). *See also Pulliam v. Coastal Emergency Services of Richmond, Inc.,* 509 S.E.2d 307, 314 (Va. 1999); *Bagley v. Shortt,* 410 S.E.2d 738 (Ga. 1991). Therefore, the legislature necessarily has the power to limit punitive damages.

A separation of powers violation would actually occur if we were to adopt plaintiffs' argument here. Under our system of government, it is anathema for a court to act as a legislature, test the political winds, or substitute its own preferences for those of the legislative representatives of the people.

The General Assembly is where public policy is better debated. The General Assembly is where compromise, sometimes the result of years of discussion evolving over numerous sessions, can occur. The General Assembly is where lawmakers can consider scenarios broader than just the specific factors attendant to a particular case. Our authority is limited, and the acceptance of that limitation is a public trust we are bound to keep in the promotion of a properly aligned government.

> If, then, a government composed of Legislative, Executive and Judicial departments, were established by a Constitution, which imposed no limits on the legislative power, the consequence would inevitably be, that whatever the legislative power chose to enact, would be lawfully enacted, and the judicial power could never interpose to pronounce it is void. It is true, that some speculative jurists have held, that a legislative act against natural justice must, in itself, be void; but I cannot think that, under such a government, any Court of Justice would possess a power to declare it so. . . . If, on the other hand, the Legislature of the union, or the Legislature of any member of the Union, shall pass a law, within the general scope of their constitutional power, the

Court cannot pronounce it to be void, merely because it is, in their judgment, contrary to the principles of natural justice.

*Calder v. Bull*, 3 U.S. 386, 1 L. Ed. 648 (1798) (Iredell, J., concurring in the result). Further, the General Assembly has the right to experiment with new modes of dealing with old evils, except as prevented by the Constitution. *See Martin v. North Carolina Housing Corp.*, 277 N.C. 29, 175 S.E.2d 665 (1970). Absent constitutional restraint, public policy questions are for legislative determination. *Id.* at 41, 175 S.E.2d at 671.

However, there is a judicial duty to examine a statute and determine its constitutionality when the issue is properly presented. *State v. Arnold*, 147 N.C. App. 670, 557 S.E.2d 119 (2001). In doing so, the statute is presumed constitutionally valid unless and until the contrary is shown. *Id.* (citing *State v. Anderson*, 275 N.C. 168, 175, 166 S.E.2d 49, 50 (1969)). Here, the contrary has not been shown and we reject plaintiffs' contention that section 1D-25 violates the principle of separation of powers.

## C. Open Courts Guarantee

The open courts provision of the North Carolina Constitution provides that "[a]ll courts shall be open; every person for an injury done him in his lands, goods, person, or reputation shall have remedy by due course of law; and right and justice shall be administered without favor, denial, or delay." N.C. Const. Art. I, § 18. The "remedy by due course of law" clause has been described as a "proper and adequate remedy." *Bolick v. American Barmag Corp.*, 54 N.C. App. 589, 592, 284 S.E.2d 188, 190 (1981), *modified*, 306 N.C. 364, 293 S.E.2d 415 (1982).

Our Supreme Court has held that "the function of deterrence . . . will not be served if the wealth of the defendant allows him to absorb the award with little or no discomfort." *Watson v. Dixon*, 352 N.C. 343, 348, 532 S.E.2d 175, 178 (2000) (citations omitted). Plaintiffs claim section 1D-25 violates this provision by offering a meaningless remedy.

In *Osborn v. Leach*, 135 N.C. 628, 47 S.E. 811 (1904), our Supreme Court held that a statute eliminating punitive damages in an action for libel was not unconstitutional under the open courts guarantee because it did not limit the recovery of *actual* damages. The *Osborn* court went on to say actual damages are those "as the plaintiff has suffered in respect to his property, business, trade, profession or

RHYNE v. K-MART CORP.

[149 N.C. App. 672 (2002)]

occupation." *Id.* at 634. The *Osborn* court explained that "[t]he right to have punitive damages assessed is, therefore, not property. The right to recover actual or compensatory damages *is property*." *Id.* at 633 (emphasis in original).

In the instant case, actual damages were not limited. Accordingly, we reject plaintiffs' argument that section 1D-25 violates the open courts guarantee.

### D. Special Legislation

Plaintiffs contend section 1D-25 violates two requirements of the North Carolina Constitution involving special legislation.

First, they state it violates the provision that the "General Assembly shall not enact any local, private, or special act or resolution . . . . [r]emitting fines, penalties, and forfeitures, or refunding moneys legally paid into the public treasury[.]" (sic) N.C. Const. Art. II, § 24, cl.(1)(i). As aforementioned, we have held that the damages cap does not constitute remittitur.

Second, they assert the statute violates the provision that "[n]o person or set of persons is entitled to exclusive or separate emoluments or privileges from the community but in consideration of public services." N.C. Const. Art. I, § 32. However, the punitive damages cap equally applies to all defendants. Plaintiffs have not shown that the statute creates a distinction between groups. *See infra*, Section I.E.

Consequently, we reject plaintiffs' assertion that section 1D-25 constitutes special legislation or that it violates either of these constitutional provisions.

### E. Due Process and Equal Protection

The North Carolina Constitution provides that:

> No person shall be taken, imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner deprived of his life, liberty, or property, but by the law of the land. No person shall be denied the equal protection of the laws; nor shall any person be subjected to discrimination by the State because of race, color, religion, or national origin.

N.C. Const. Art. I, § 19. Plaintiffs contend the punitive damages cap: (1) constitutes a taking of property without just compensation, infringing on a fundamental right; and (2) treats similarly sit-

uated persons differently without compelling reason or rational justification.

Plaintiffs argue the punitive damages award is the fruit of their labor and therefore a form of property. Nevertheless, we have held punitive damages do not constitute property belonging to an individual. Thus, there can be no taking of property by placing a cap on punitive damages and no infringement of the right to enjoy the fruits of one's own labor. We note there is no constitutional right to a jury trial on punitive damages, as we held in Section I.A.

Because there is no fundamental right involved and the statute makes no mention of suspect classifications, section 1D-25 should be subjected to a rational basis review. In a rational basis review, the party challenging a statute must show that it bears no rational relationship to any legitimate government interest. *Department of Transp. v. Rowe*, 353 N.C. 671, 549 S.E.2d 203 (2001), *cert. denied*, 534 U.S. ——, 151 L. Ed. 2d 972 (2002).

Plaintiffs complain that section 1D-25 treats similarly situated plaintiffs who receive jury verdicts that include a punitive damage award, differently. They argue it does so without rational justification by enabling some to receive the full measure of the jury verdict and others to receive only an arbitrarily derived amount that is less than the jury award. Plaintiffs assert that there is no rational relationship between the statute and a legitimate state interest because there is no punitive damages crisis in North Carolina.

Whether a statute violates due process is a question of degree of reasonableness. *Lowe v. Tarble*, 312 N.C. 467, 323 S.E.2d 19 (1984). Our Supreme Court has held that if the legislature *reasonably could have concluded* that there was a rational relationship between the punitive damages cap and the State's legitimate interest in its economic development, the rational basis review ends in the State's favor. *See Lowe v. Tarble*, 312 N.C. 467, 472, 323 S.E.2d 19, 22 (1984). Likewise, here, the legislature could have concluded that the enactment of section 1D-25 was for the legitimate public purpose of preserving and furthering the economic development of North Carolina.

Plaintiffs cannot prevail if the question is at least debatable. *See id.* Here, it is at least debatable. For the Fourth Circuit, the question was actually resolved when the court held that a punitive damages cap bore a rational relationship to a proper governmental purpose—

to limit the jury's punitive damages awards to those that punish and deter and to prevent awards that would burden the state's economy. *Wackenhut Applied Technologies Center Inc. v Sygnetron Protection Systems, Inc.*, 979 F.2d 980 (4th Cir. Va. 1992).

Additionally, there is no requirement that the legislature be only reactive. There does not have to be a present crisis in North Carolina or even in the United States. Whenever it would be reasonable, the legislature may, and should, be proactive.

Due process is a critical component of our constitutional foundation. It is an essential protection, one which should be carefully and precisely applied rather than devalued through random use as a residual depository. Due process is not an endless drama encumbered only by the limits of our collective imagination.

Plaintiffs cannot carry their burden of showing the statute bears no rational relationship to any legitimate government interest, and we reject their argument.

### F. Vagueness

Plaintiffs contend section 1D-25 is unconstitutionally vague because the trial judge was unable to determine how it should be applied.

A statute is unconstitutionally vague when:

"men of common intelligence must necessarily guess at [the statute's] meaning and differ as to its application." . . . Even so, impossible standards of statutory clarity are not required by the constitution. When the language of a statute provides adequate warning as to the conduct it condemns and prescribes boundaries sufficiently distinct for judges and juries to interpret and administer it uniformly, constitutional requirements are fully met.

*In Re Burrus*, 275 N.C. 517, 531, 169 S.E.2d 879, 888 (1969), *aff'd, McKeiver v. Pennsylvania*, 403 U.S. 528, 29 L. Ed. 2d 647 (1971) (citations omitted). "The statute must be examined in light of the circumstances in each case, and [the party challenging the statute has] the burden of showing either that the statute provides inadequate warning as to the conduct it governs or is incapable of uniform judicial administration." *State v. Covington*, 34 N.C. App. 457, 238 S.E.2d 794 (1977), *disc. rev. denied*, 294 N.C. 184, 241 S.E.2d 519 (1978).

"Impossible standards of clarity are not required by the constitution." *Lowe*, 312 N.C. at 469, 323 S.E.2d at 21. In *Tetterton v. Long Mfg. Co., Inc.*, 314 N.C. 44, 332 S.E.2d 67 (1985), our Supreme Court held that a statute was not vague simply because it could be interpreted three different ways. The true meaning of the statute can be deciphered using rules of statutory construction, which we employ in the next section. *See infra*, Section II.

To reason otherwise, many, if not most, of the statutes which become subject to our analysis would be unconstitutional. Few arrive at this Court when all agree on their interpretations.

After carefully examining the language of section 1D-25, in light of the facts of the instant case, we conclude that the statute provides sufficient language for uniform judicial administration. We therefore reject plaintiffs' final constitutional argument.

## II. The Application of the Punitive Damages Cap

[2] We now turn to the statutory interpretation of section 1D-25. The trial court awarded each plaintiff $250,000. K-Mart argues the damages cap should be per defendant. Plaintiffs contend the punitive damages cap should be per claim.

In resolving issues of statutory interpretation, we look first to the language of the statute itself. *Sara Lee Corp. v. Carter*, 351 N.C. 27, 519 S.E.2d 308, *reh'g denied*, 351 N.C. 191, 541 S.E.2d 716 (1999). Where doubt as to the meaning of the statutory language exists, our courts will then resort to judicial construction. *Richardson v. McCracken Enterprises*, 126 N.C. App. 506, 508, 485 S.E.2d 844, 846 (1997), *aff'd*, 347 N.C. 660, 496 S.E.2d 380 (1998). In these matters, the task of the Court is to ascertain and adhere to the intent of the legislature. *Brooks, Comr. of Labor v. McWhirter Grading Co., Inc.*, 303 N.C. 573, 587, 281 S.E.2d 24, 33 (1981). To ascertain legislative intent with regard to the cap, we presume that the legislature acted with full knowledge of prior and existing law and its construction by the courts. *Raeford Lumber Co. v. Rockfish Trading Co.*, 163 N.C. 314, 317, 79 S.E. 627, 628-29 (1913).

Again, section 1D-25 provides:

> (a) In all actions seeking an award of punitive damages, the trier of fact shall determine the amount of punitive damages separately from the amount of compensation for all other damages.

(b) Punitive damages awarded against a defendant shall not exceed three times the amount of compensatory damages or two hundred fifty thousand dollars ($250,000), whichever is greater. If a trier of fact returns a verdict for punitive damages in excess of the maximum amount specified under this subsection, the trial court shall reduce the award and enter judgment for punitive damages in the maximum amount.

(c) The provisions of subsection (b) of this section shall not be made known to the trier of fact through any means, including voir dire, the introduction into evidence, argument, or instructions to the jury.

N.C. Gen. Stat. § 1D-25 (1999). By our textual analysis, we hold the cap should be applied per plaintiff.

Section 1D-25(b) limits punitive damages to no more than three times the compensatory damages awarded or $250,000, whichever is greater. N.C. Gen. Stat. § 1D-25(b). All compensatory damages awarded to a party must therefore be totaled to one number for consideration of the cap. Here, it was $8,255 for Mr. Rhyne and $10,730 for Mrs. Rhyne. Because each was far less than one-third of $250,000, the appropriate cap was $250,000. If the compensatory award had been one million dollars for Mr. Rhyne, however, and if there had been three claims subject to punitive damages, plaintiffs' argument would have resulted in the cap being the product of three times compensatory damages times the three claims. That result would allow duplicate credit for one compensatory award, a result which clearly would require a re-writing of section 1D-25.

The statute further states that "[i]n all actions seeking an award of punitive damages, the trier of fact shall determine the amount of punitive damages separately from the amount of compensation for all other damages." N.C. Gen. Stat. § 1D-25(a). The phrases "*an* award" and "*the* amount of punitive damages" both speak to a *single* award for each plaintiff. As to compensatory damages, "the amount of compensation for all other damages" clearly speaks of one amount for the combination of those damages. Were it otherwise, the General Assembly could easily have made plural the terms "the amount" and "an award." It did not, and we are therefore bound by the text of the statute.

To receive a verdict for punitive damages, a party must prove one or more specified aggravating factors. *See* N.C. Gen. Stat. § 1D-35

(1999). The jury then uses the full combination of those factors when arriving at one number or amount as the award. To be consistent in determining the statutory cap, there is one total for compensatory damages to be applied to one number for punitive damages.

K-Mart cites a West Virginia medical malpractice statute which provides a one million dollar cap on punitive damages. *See* W. Va. Code Ann. § 55-7B-8 (2000). In *Robinson v. Charleston Area Med. Ctr., Inc.*, 414 S.E.2d 877 (W.Va. 1991), the West Virginia Supreme Court held the cap was constitutional and should be applied on a per defendant basis because the statute was phrased in terms of the defendant, not the plaintiff. *Id.* at 888. However, we decline to adopt that rationale because we do not believe it is consistent with the text of our statute and what our courts have determined punitive damages to represent.

"The purpose of punitive damages is to punish wrongdoers for misconduct of an aggravated, extreme, outrageous, or malicious character." *Nance v. Robertson*, 91 N.C. App. 121, 123, 370 S.E.2d 283, 284, *rev. denied*, 323 N.C. 477, 373 S.E.2d 865 (1988). "The purpose . . . is not to compensate a plaintiff for personal injuries. Instead, [punitive damages] are awarded to punish the defendant's conduct." *Kuykendall v. Turner*, 61 N.C. App. 638, 643, 301 S.E.2d 715, 719 (1983) (citing E. Hightower, *N.C. Law of Damages* § 4-1 (1981)).

K-Mart's suggestion would require joined parties to divide a punitive damages award that was subject to the cap. Our courts have encouraged parties to join in lawsuits to better consolidate and facilitate cases. *Bockweg v. Anderson*, 333 N.C. 486, 428 S.E.2d 157 (1993); *State v. Cottingham*, 30 N.C. App. 67, 226 S.E.2d 387 (1976); *Smith v. Pate*, 246 N.C. 63, 67, 97 S.E.2d 457, 460 (1957). K-Mart's proposal would *discourage* parties from joining. Plaintiffs would not take the chance that their possible recoveries would be diluted, not by any defect in their claims, but solely because there was more than one plaintiff.

In the case at bar, both plaintiffs were injured by K-Mart's wrongdoing. Consequently, K-Mart owes punitive damages in the amount of $250,000 *per plaintiff*, totaling $250,000 to Mr. Rhyne and $250,000 to Mrs. Rhyne.

[3] We must now determine if the modified award is excessive. A new trial may be granted on any issue due to "[e]xcessive or in-

adequate damages appearing to have been given under the influence of passion or prejudice." N.C. Gen. Stat. § 1A-1, Rule 59(a)(6) (1999).

In *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 134 L. Ed. 2d 809 (1996), the United States Supreme Court held that a punitive damages award of $2,000,000 was grossly excessive in light of a low level of reprehensibility of conduct and 500 to 1 ratio between the award and the actual harm to the victim. When an award is "grossly excessive," it violates the due process clause of the Fourteenth Amendment. *Id.* at 568. The Court stated that:

Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct. As the Court stated nearly 150 years ago, exemplary damages imposed on a defendant should reflect "the enormity of his offense." This principle reflects the accepted view that some wrongs are more blameworthy than others. Thus, we have said that "nonviolent crimes are less serious than crimes marked by violence or the threat of violence." Similarly, "trickery and deceit," are more reprehensible than negligence. . . .

The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff. The principle that exemplary damages must bear a "reasonable relationship" to compensatory damages has a long pedigree. . . . [W]e have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award. Indeed, low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine. It is appropriate, therefore, to reiterate our rejection of a categorical approach. . . . Comparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct provides a third indicium of excessiveness. . . .

[A] reviewing court engaged in determining whether an award of punitive damages is excessive should "accord 'substan-

tial deference' to legislative judgments concerning appropriate sanctions for the conduct at issue."

*Id.* at 576-83 (footnotes and citations omitted).

In the instant case, the ratio of actual harm to the award is approximately 30 to 1 for Mr. Rhyne and 23 to 1 for Mrs. Rhyne. We also note that the actions of Roberts and Hoyle were violent. Roberts attacked Mr. Rhyne and put him in a chokehold for several minutes. Hoyle kept Mrs. Rhyne from helping her husband and pushed her to the ground. Further, to keep plaintiffs from taking out criminal charges against it, K-Mart accused plaintiffs of trespassing and instituted assault charges against Mr. Rhyne. Plaintiffs suffered both physical and psychological problems as a result and Mrs. Rhyne now has a permanent heart condition that is arguably traceable to the incident at issue. We thus hold that in light of: (1) K-Mart's reprehensible conduct, which constituted more than mere negligence; (2) the relatively low ratio; and (3) deference given to the legislature, the awards are not grossly excessive under the *BMW* factors.

### III.  Attorney Fees

[4] Finally, plaintiffs argue the trial court erred by refusing to award attorney fees pursuant to N.C. Gen. Stat. § 1D-45. We disagree.

Section 1D-45 provides, in pertinent part, "[t]he court shall award reasonable attorney fees against a defendant who asserts a defense in a punitive damages claim that the defendant knows or should have known to be frivolous or malicious." N.C. Gen. Stat. § 1D-45 (1999). "The purpose of providing the costs of legal representation is to encourage professional peer review by limiting the possibility of unreasonable litigation expenses." *Virmani v. Presbyterian Health Services Corp.*, 127 N.C. App. 71, 488 S.E.2d 284, *rev. denied*, 347 N.C. 141, 492 S.E.2d 38 (1997) (citing *Smith v. Ricks*, 31 F.3d 1478, 1487 (9th Cir. 1994), *cert. denied*, 514 U.S. 1035, 131 L. Ed. 2d 287 (1995)).

A defense is frivolous if "a proponent can present no rational argument based upon the evidence or law in support of [it]." *Black's Law Dictionary* 668 (6th ed. 1990). A defense is malicious if it is "wrongful and done intentionally without just cause or excuse or as a result of ill will." *Black's Law Dictionary* 958 (6th ed. 1990).

Here, plaintiffs discuss how K-Mart engaged in malicious acts or practices as a corporation, but fail to establish how K-Mart's *defense*

may have been malicious or frivolous. "An abuse of discretion occurs when the trial court's ruling 'is so arbitrary that it could not have been the result of a reasoned decision.' " *Chicora Country Club, Inc. v. Town of Erwin,* 128 N.C. App. 101, 109, 493 S.E.2d 797, 802 (1997), *disc. rev. denied,* 347 N.C. 670, 500 S.E.2d 84 (1998) (quoting *White v. White,* 312 N.C. 770, 777, 324 S.E.2d 829, 833 (1985)). No such abuse has been shown under these circumstances and we therefore reject plaintiffs' argument.

## IV. New Trial

**[5]** K-Mart argues that it is entitled to a new trial because the trial court erred in allowing plaintiffs to introduce evidence of its discovery misconduct. We disagree.

Throughout the testimony in question, defense counsel never specifically objected to the inclusion of evidence demonstrating K-Mart's misconduct during discovery on the grounds now argued. Defense counsel did object several times to the form of a question regarding discovery misconduct and to certain phrases in a question such as "refused to provide," "conceal," and "did not disclose."

It is a long-standing rule that a party in a civil case may not raise an issue on appeal that was not raised at the trial level. *See* N.C.R. App. P. 10(b)(1); *Hieb v. Lowery,* 121 N.C. App. 33, 39, 464 S.E.2d 308, 312 (1995), *aff'd,* 344 N.C. 403, 474 S.E.2d 323 (1996). K-Mart did not raise this issue before the trial court. Only as an assignment of error in the record and as an issue in defendants' brief did the contention materialize. Accordingly, this assignment of error is not properly before us and we decline to proceed with its determination.

## V. Conclusion

In conclusion, we hold that: (1) section 1D-25 is constitutional; (2) section 1D-25 should be applied on a per plaintiff basis; (3) the trial court did not abuse its discretion in disallowing attorney fees; and (4) K-Mart is not entitled to a new trial.

AFFIRMED.

Judge HUNTER concurs.

Judge GREENE concurs in part and dissents in part.

**RHYNE v. K-MART CORP.**

[149 N.C. App. 672 (2002)]

GREENE, Judge, concurring in part and dissenting in part.

I concur in the majority opinion with respect to issues III and IV but write separately to voice my dissent regarding the constitutionality of N.C. Gen. Stat. § 1D-25(b).

---

The dispositive issues are whether: (I)(A) there is a constitutionally protected right to a jury trial on the issue of punitive damages in tort actions for false imprisonment, malicious prosecution, negligence and/or intentional infliction of emotional distress; if so, (B) a legislatively imposed limitation on punitive damages impermissibly infringes on this right to a jury trial; (II) the legislatively imposed limitation on punitive damages violates the due process clause of article I, section 19 of the North Carolina Constitution; and (III) the jury award of $11.5 million in punitive damages per plaintiff is excessive under the due process clause of the U.S. Constitution.

I

A

*Constitutional Right to Jury Trial on Punitive Damages*

The North Carolina Constitution provides in article I, section 25 that "[i]n all controversies at law respecting property, the ancient mode of trial by jury is one of the best securities of the rights of the people, and shall remain sacred and inviolable." N.C. Const. art. I, § 25. In construing this provision, our courts have held there is a constitutional right to a jury trial only in cases involving a cause of action (including a remedy) recognized at the time of the adoption of the 1868 North Carolina Constitution[1] and where there existed, either at common law or by statute at that time, a right to a jury trial in such instances. *Kiser v. Kiser*, 325 N.C. 502, 507, 385 S.E.2d 487, 490 (1989); *Groves v. Ware*, 182 N.C. 553, 558, 109 S.E. 568, 571 (1921).

I acknowledge some of our Supreme Court cases have employed the "in all controversies . . . respecting property" language of article I, section 25 in a manner that suggests the constitutional right to a jury depends on the existence of a claim involving "property." *See Belk's Dep't Store, Inc. v. Guilford County*, 222 N.C. 441, 447, 23 S.E.2d 897, 902 (1943) (valuation of land for taxation purposes "does not affect any right in the property"); *Smith v. Campbell*, 10 N.C. 595, 597 (1825) (debt is not property). Some recent cases have made reference to the

---

1. The 1868 North Carolina Constitution was adopted in April 1868. *See* John V. Orth, *The North Carolina State Constitution* 13 (1993).

**RHYNE v. K-MART CORP.**

[149 N.C. App. 672 (2002)]

"property" test as an element in determining a party's right to a jury trial without utilizing it. *See State v. Simpson,* 325 N.C. 514, 517-18, 385 S.E.2d 329, 331-32 (1989). I have not found any case since 1943 in which our appellate courts have determined a party was or was not entitled to a jury trial on the basis the claim did or did not "respect[] property." In several instances where it appears obvious the claims were "respecting property," the court did not reach the issue. *See, e.g., Kiser,* 325 N.C. at 507-08, 385 S.E.2d at 490 (analysis of right to jury trial in equitable distribution proceeding); *Kaperonis v. Highway Comm'n,* 260 N.C. 587, 595-96, 133 S.E.2d 464, 470-71 (1963) (analysis of right to jury trial in condemnation proceeding). Furthermore, in cases where the claim obviously did not involve a property question, the appellate court discussed only the question of whether the claim was in existence prior to April 1868. *See, e.g., In re Clark,* 303 N.C. 592, 607, 281 S.E.2d 47, 57 (1981) (analysis of right to jury trial in termination of parental rights proceeding); *In re Taylor,* 25 N.C. App. 642, 643-44, 215 S.E.2d 789, 790 (1975) (analysis of right to jury trial in mental health commitment proceeding). Thus, the "in all controversies . . . respecting property" language giving rise to the right to a jury trial has evolved into the single test of whether this right existed prior to April 1868. To hold otherwise would eradicate the constitutional right to a jury trial in those actions where the right was recognized prior to April 1868 simply because the cause of action is found not to involve a property interest.[2]

It may, of course, be the case that the "respecting property" prong has remained in effect all along but required no consideration because our courts have construed the phrase "in all controversies . . . respecting property" liberally so as to "include all the old forms of action at common law." 2 McIntosh, *North Carolina Practice and Procedure* § 1432, at 3 (2d ed. 1956) ("the term, 'in all controversies respecting property,' . . . would seem to include all the old forms of action at common law"); *see also Kiser,* 325 N.C. at 505 n.1, 385 S.E.2d at 488 n.1 ("all issues of fact in causes of action existing [in 1868] would be entitled to be tried by jury"). Our society's notion of property has evolved greatly since our Supreme Court rendered its decision in *Smith v. Campbell* in 1825 on which the majority relies. *See Smith v. Campbell,* 10 N.C. 595 (1825). For instance, the idea expressed in *Smith* "that property must necessarily mean dominion over things ha[s] given way to a more expanded view."

---

2. Thus, if the courts were to accept a limited definition of "in all controversies . . . respecting property," the legislature could, for example, adopt a statute eliminating the right to jury trials in all negligence and breach of contract actions.

1 *Valuation and Distribution of Marital Property* § 18.02[1], at 18-8
to 18-9 (2002) [hereinafter *Valuation and Distribution*]; *Smith*, 10
N.C. at 597. Property has since been regarded as "a bundle of rights,
not over things, but pertaining to any valuable interest." *Valuation
and Distribution* at 18-9. Apparently, what is property "bears heavily
upon the sociological climate of the times." *Id.* at 18-12.

Thus, today, plaintiffs' tort claims, including their prayer for
punitive damages would be considered "property" within the mean-
ing of article I, section 25 as they derive from injuries to the person.
" 'Where an injury has occurred for which the injured party has a
cause of action, such cause of action is a vested property right.' "
*Lamb v. Wedgewood S. Corp.*, 308 N.C. 419, 442, 302 S.E.2d 868, 881
(1983) (quoting *Burmaster v. Gravity Drainage Dist. No. 2*, 366 So.
2d 1381 (La. 1978)). Furthermore, because "every man has a property
in his own person," John Locke, *Second Treatise of Government* 17
(T. Peardon ed., 1952), injury to a person is injury to property and the
constitutionally protected right to a jury trial attaches.

The claim for intentional infliction of emotional distress was not
recognized in this State until 1979, *see Stanback v. Stanback*, 297 N.C.
181, 196, 254 S.E.2d 611, 621-22 (1979), and thus Plaintiffs have no
constitutional right to a jury trial on this claim. Claims for false
imprisonment, malicious prosecution, and negligence, however, were
in existence prior to April 1868. *See Arrington v. Wilmington &
Weldon R.R. Co.*, 51 N.C. 68 (1858) (negligence); *Bradley v. Morris*,
44 N.C. 395 (1853) (malicious prosecution); *Sawyer v. Jarvis*, 35 N.C.
179 (1851) (false imprisonment). Prior to 1868, the right to have a jury
assess punitive damages also existed for each of these claims. *See
Bradley*, 44 N.C. at 397; *Sawyer*, 35 N.C. at 181; *see also Gilreath v.
Allen*, 32 N.C. 67, 69 (1849) (punitive damages permitted in any tort
action upon showing of "circumstances of aggravation"). Thus, a con-
stitutional right to a jury trial exists in this State on a party's claim for
punitive damages arising from any tort recognized in North Carolina
prior to April 1868 in which there are genuine issues of fact showing
"aggravating factors" as outlined in N.C. Gen. Stat. § 1D-15(a).[3]

---

3. According to our case law, the right to a jury trial hinges on the existence of
aggravating circumstances. *See Gilreath*, 32 N.C. at 69. If there are no aggravating cir-
cumstances, there is no right to a jury trial. Who then determines whether there are
aggravating circumstances? If we allow the jury to make this determination, the result
is the grant of a jury trial in every instance where there are allegations of aggravating
circumstances. This would be an unacceptable process and not consistent with article
I, section 25. Thus, there must be some preliminary showing by the claimant of the
existence of some aggravating circumstance. This can be satisfied upon a trial court's

Consequently, I reject K-Mart's argument that a legislative limitation on punitive damages awards is within the sole province of the legislature and does not implicate a party's right to a jury trial under article I, section 25. It may be that the legislature can *eliminate* punitive damages as a remedy in North Carolina. *See Osborn v. Leach*, 135 N.C. 628, 47 S.E. 811 (1904) (upholding legislative elimination of punitive damages in libel cases where no aggravating circumstances exist).[4] The answer to that question, however, is more involved than the majority suggests and lies within the meaning of article I, section 18 of the North Carolina Constitution (open courts provision), *see id.* at 631, 47 S.E.2d at 812, and article I, section 19 (law of the land provision), *see Lowe v. Tarble*, 313 N.C. 460, 461, 329 S.E.2d 648, 650 (1985) (due process clause prohibits arbitrary legislation), not article I, section 25. If the legislature permits an award of punitive damages, the article I, section 25 right to a jury trial necessarily attaches and any limitation on the amount of damages rests with the jury and the trial court.[5] *See Worthy v. Shields*, 90 N.C. 192, 196 (1884) ("jury verdict cannot be disregarded"). To hold otherwise would constitute an impermissible interference with the jury's absolute right to determine a plaintiff's entitlement to punitive damages and the amount of those damages.

B

*Infringement of Constitutional Right to Jury Trial*

Fundamental rights include those either explicitly or implicitly guaranteed by the state or federal constitution, *see Comer v. Ammons*, 135 N.C. App. 531, 539, 522 S.E.2d 77, 82 (1999); *In re Buck*,

---

determination that there are genuine issues of fact on the question of aggravation. *Cf.* N.C.G.S. § 1A-1, Rule 56 (1999) (rule on summary judgment).

4. In essence, the legislative elimination of punitive damages for certain libel cases as upheld in *Osborn* merely constituted a codification of the common law, which permitted punitive damages only where aggravating circumstances existed. *See Gilreath*, 32 N.C. at 69 (punitive damages permitted in any tort action upon showing of "circumstances of aggravation").

5. Any abuse in punitive damages awards is currently addressed on a case-by-case basis as provided for at common law, *see Worthington v. Bynum*, 305 N.C. 478, 491, 290 S.E.2d 599, 607 (1982) (Britt, J., dissenting) (trial court may award new trial if damages are given "under the influence of passion or prejudice"); *Carawan v. Tate*, 53 N.C. App. 161, 165, 280 S.E.2d 528, 531 (1981) (trial court has discretion to "reduce" punitive damages award if it is "excessively disproportionate to the circumstances of contumely and indignity present in the case"), *modified and affirmed*, 304 N.C. 696, 286 S.E.2d 99 (1982), and under federal constitutional law, *see BMW of North America, Inc. v. Gore*, 517 U.S. 559, 562, 134 L. Ed. 2d 809, 822 (1996) (Due Process Clause prohibits the imposition of a "grossly excessive" punishment against a tortfeasor).

**RHYNE v. K-MART CORP.**

[149 N.C. App. 672 (2002)]

350 N.C. 621, 626, 516 S.E.2d 858, 861 (1999) ("fundamental right to trial by jury . . . is guaranteed by our Constitution"), or those that are deeply rooted in the traditions of our people, *State v. Tolley*, 290 N.C. 349, 364, 226 S.E.2d 353, 365 (1976). As the right to a jury trial on punitive damages is guaranteed by our state constitution, *see* N.C. Const. art. I, § 25, and is firmly rooted in the traditions of our people, *see, e.g., Bradley*, 44 N.C. at 397, the right to a jury trial on punitive damages is a fundamental right. Because this fundamental right is not absolute, it can be invaded upon enactment of a statute that is "narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 302, 123 L. Ed. 2d 1, 16 (1993); *see Department of Transp. v. Rowe*, 353 N.C. 671, 676, 549 S.E.2d 203, 208 (2001) (strict scrutiny triggered by infringement of fundamental right), *cert. denied*, —— U.S. ——, ——, L. Ed. 2d ——, 70 U.S.L.W. 3395 (2002). The party asserting the constitutionality of a statute that invades a fundamental right has the burden of demonstrating its constitutionality. *Rowe*, 353 N.C. at 675, 549 S.E.2d at 207; *Dixon v. Peters*, 63 N.C. App. 592, 598, 306 S.E.2d 477, 481 (1983).

The statue before this Court in this case, Section 1D-25(b), places a legislative limitation on the amount of punitive damages a party may recover. *See* N.C.G.S. § 1D-25(b) (1999) ("[p]unitive damages . . . shall not exceed three times the amount of compensatory damages or two hundred fifty thousand dollars ($250,000), whichever is greater"). This statute requires the trial court, in some instances, to "reduce the [punitive damages] award," *id.*, and thus invades plaintiffs' right to have the jury assess the amount of punitive damages. K-Mart, the proponent of the constitutionality of this statute, therefore has the burden of proving it was enacted to serve a compelling state interest and if so, that it was narrowly drawn to serve that interest. *See Reno*, 507 U.S. at 302, 123 L. Ed. 2d at 16; *Rowe*, 353 N.C. at 676, 549 S.E.2d at 208. In support of this burden, K-Mart argues the statute serves the best interest of the State by "preserving and promoting economic development in the State of North Carolina, as well as fostering [public] confidence in the civil litigation system." Admittedly, encouraging economic development and ensuring public confidence in the judicial system are legitimate state interests. There is nothing, however, in this record to show the limits on punitive damages awards serve these goals or even if they did, that the interests served are compelling.[6] Indeed, the reduction of punitive damages awarded by a

---

6. There are affidavits in this record from two legislators who were in the General Assembly at the time chapter 1D was adopted. The legislators affirm "[t]here was no

jury after extensive deliberations could erode public confidence in our judicial system. Accordingly, the limitation on punitive damages awards, as set forth in section 1D-25(b), is unconstitutional with respect to claims that were recognized in North Carolina prior to April 1868 where there also existed a right to have a jury assess punitive damages. As section 1D-25(b) does not attempt to distinguish between those occasions where a party has a constitutional right to a jury trial on the determination of punitive damages and where there is no such right, the statute is overbroad and thus unconstitutional. *See State v. Hines*, 122 N.C. App. 545, 552, 471 S.E.2d 109, 114 (1996) ("a law is void on its face if it sweeps within its ambit not solely activity that is subject to governmental control, but also includes within its prohibition, the practice of a protected constitutional right").

## II

### *Substantive Due Process*

The law of the land clause of the North Carolina Constitution provides in article I, section 19 that "[n]o person shall be . . . in any manner deprived of his life, liberty, or property, but by the law of the land." N.C. Const. art. I, § 19. "Any exercise by the State of its police power is . . . a deprivation of liberty." *In re Hospital*, 282 N.C. 542, 550, 193 S.E.2d 729, 735 (1972). Every deprivation of liberty, however, does not constitute a violation of a person's substantive due process rights granted under article I, section 19. A violation occurs only if the statute does not have " 'a rational, real, or substantial relation to the public health, morals, order, or safety, or the general welfare.' " *Id.* at 551, 193 S.E.2d at 735 (citation omitted). In other words, the statute must be "reasonably necessary to promote the accomplishment of a public good, or to prevent the infliction of public harm." *Id.* This substantive due process right is the public's guarantee against arbitrary legislation. *Lowe*, 313 N.C. at 461, 329 S.E.2d at 650.

Section 1D-25(b), which places a limit on the amount of punitive damages a person may recover, is without question an exercise of the State's police power. But the statute also constitutes a deprivation of liberty in that it denies a party a right, recognized at common law, to have a jury determine the amount of punitive damages. *See Meyer v. Nebraska*, 262 U.S. 390, 399, 67 L. Ed. 1042, 1045 (1923) (defining liberty to include "those privileges long recognized at common law as

---

evidence introduced during either the committee meetings or on the floor about excessive punitive awards or the number of punitive awards in North Carolina."

essential to the orderly pursuit of happiness by free men"). Accordingly, section 1D-25(b) can be sustained against an article I, section 19 attack only if it has some rational or substantial relationship to the general welfare of this State.

K-Mart contends the general welfare of the State is served by this statute because it fosters and preserves economic development and encourages "[public] confidence in the civil litigation system." As noted in section I(B) of this opinion, K-Mart has offered nothing to show that section 1D-25(b) serves either of these general purposes. Plaintiffs, on the other hand, have produced authority on the low incidence and general stability of punitive damages awards in North Carolina. Plaintiffs further provided affidavits by two legislators revealing there had been no evidence of a punitive damages crisis presented to the General Assembly at the time it adopted section 1D-25(b). There is, thus, no "substantial relation" between section 1D-25(b) and the asserted purposes for its enactment. *See In re Hospital*, 282 N.C. at 551, 193 S.E.2d at 735. Accordingly, section 1D-25(b) violates article I, section 19 of the North Carolina Constitution because it arbitrarily denies a party the full and unconditional right to have a jury determine the amount of punitive damages.

III

*Excessiveness of Punitive Damages Award*

K-Mart contends that if this Court were to hold section 1D-25(b) to be unconstitutional, the punitive damages award would, consistent with the federal Due Process Clause, have to be vacated and a new trial ordered or the award reduced.

In *Gore*, the United States Supreme Court found the Due Process Clause of the Fourteenth Amendment to "prohibit[] a State from imposing a " 'grossly excessive" punishment on a tortfeasor.' " *Gore*, 517 U.S. at 562, 134 L. Ed. 2d at 818 (quoting *TXO Prod. Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 454, 125 L. Ed. 2d 366, 379 (1993) (citation omitted)). Whether the award is "grossly excessive" must be determined in the context of the State's interest in punishing the tortfeasor and deterring any such future misconduct. *Id.* at 568, 134 L. Ed. 2d at 822. The *Gore* court specifically noted "[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice . . . of the severity of the penalty that a State may impose." *Id.* at 574, 134 L. Ed. 2d at 826. In order to determine "fair notice," three factors must be considered: (1) the

RHYNE v. K-MART CORP.

[149 N.C. App. 672 (2002)]

degree of reprehensibility of the defendant's conduct, (2) the ratio between the punitive damages award and the harm done or the potential harm that could have occurred, and (3) available sanctions for comparable misconduct. *Id.* at 575, 134 L. Ed. 2d at 826. Appellate courts should apply a *de novo* standard of review in deciding whether a punitive damages award is unconstitutionally excessive. *Cooper Indus. v. Leatherman Tool Group*, 532 U.S. 424, 431, 149 L. Ed. 2d 674, 686-87 (2001). If excessive, the matter should be remanded to the trial court to determine an appropriate remedy, which may include a new trial or a reduction of the award after an independent determination by the trial judge. *Gore*, 517 U.S at 586, 134 L. Ed. 2d at 833.

The *Gore* court characterized the degree of reprehensibility of the defendant's conduct as "[p]erhaps the most important indicium of the reasonableness of a punitive damages award" because punitive damages should reflect " 'the enormity of [the] offense.' " *Id.* at 575, 134 L. Ed. 2d at 826 (citation omitted). Aggravating factors associated with particularly reprehensible conduct include: malice, violence or a threat thereof, trickery and deceit, indifference to or reckless disregard for the health and safety of others, deliberate false statements, affirmative misconduct, concealment of evidence of improper motive, and even economic injury to a financially vulnerable party. *Id.* at 576, 579, 134 L. Ed. 2d at 826-27, 829.

The determination of the ratio between any actual or potential harm to the plaintiff and the amount of punitive damages is not meant as a simple mathematical formula by which punitive damages are automatically deemed excessive after a certain point. *Id.* at 582, 134 L. Ed. 2d at 830. One must establish " 'whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred.' " *TXO*, 509 U.S. at 460, 125 L. Ed. 2d at 381 (emphasis omitted) (quoting *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 21, 113 L. Ed. 2d 1, 22 (1991)). In *TXO*, the United States Supreme Court, in upholding the trial court's award, relied on the difference between the punitive damages award and the harm the victim could have suffered if the defendant's tortious conduct had been successful: a 10 to 1 ratio. *TXO*, 509 U.S. at 462, 125 L. Ed. 2d at 382. The *Gore* court further noted:

[L]ow awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of

economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine.

*Gore,* 517 U.S. at 582, 134 L. Ed. 2d at 831.

The third factor analyzed for purposes of fair notice focuses on the difference between the punitive damages award and the civil or criminal penalties authorized or imposed in comparable cases. *Id.* at 575, 583-85, 134 L. Ed. 2d at 826, 831. The reviewing court should " 'accord "substantial deference" to legislative judgments concerning appropriate sanctions for the conduct at issue.' " *Id.* at 583, 134 L. Ed. 2d at 831 (quoting *Browning-Ferris Indus. v. Kelco Disposal, Inc.,* 492 U.S. 257, 301, 106 L. Ed. 2d 219, 254 (1989) (O'Connor, J., concurring in part and dissenting in part)). In cases where a punitive damages award is greatly in excess of a fine that could have been imposed by statute, such an award may still stand if "imprisonment was also authorized in the criminal context." *Id.* at 583, 134 L. Ed. 2d at 831 (citing *Haslip,* 499 U.S. at 23, 113 L. Ed. 2d at 23). In considering whether a punitive damages award was justified on the ground that it serves to deter future misconduct, the reviewing court must also assess "whether less drastic remedies could be expected to achieve that goal." *Id.* at 584, 134 L. Ed. 2d at 832.

In this case, most of the aggravating factors listed in *Gore* by which to determine the reprehensibility of a defendant's conduct are present. The jury found that Mr. Rhyne had been unlawfully detained by the use of a dangerous choke-hold. The detainment was a violent encounter that showed an indifference to or reckless disregard for the health and safety of plaintiffs. In addition, Roberts and Hoyle as agents of K-Mart engaged in affirmative misconduct by making deliberate false statements to the investigating police officers. Mr. Rhyne was also found to have been maliciously prosecuted, an act that goes to malice, trickery, and deceit. As a result, this case involved a high degree of reprehensibility as opposed to *Gore,* which only dealt with economic damages. *See id.* at 576, 134 L. Ed. 2d at 827.

As K-Mart points out, the jury awarded Mr. Rhyne $8,255.00 and Mrs. Rhyne $10,730.00 in compensatory damages but $11.5 million each in punitive damages. The ratio between the compensatory and punitive damages awards is 1,393:1 for Mr. Rhyne and 1,072:1 for Mrs. Rhyne. Even though this is a staggering ratio, the potential harm plaintiffs could have suffered must also be considered. *See id.* at 581, 134 L. Ed. 2d at 830; *TXO,* 509 U.S. at 460, 125 L. Ed. 2d at 381.

According to the testimony of one of the police officers present on the scene on 29 April 1996, the hold Roberts used on Mr. Rhyne in order to detain him could have severely injured Mr. Rhyne's spinal cord, potentially paralyzing him.

North Carolina courts have upheld jury verdicts ranging from $60,000.00 in compensatory damages, *Hussey v. Seawell*, 137 N.C. App. 172, 527 S.E.2d 90 (2000) (partial paralysis), to $100,000.00, *Lowery v. Newton*, 52 N.C. App. 234, 278 S.E.2d 566 (permanent paralysis to the plaintiff's left shoulder and arm), *disc. review denied*, 303 N.C. 711 (1981); *see also Strickland v. Jackson*, 23 N.C. App. 603, 209 S.E.2d 859 (1974) (awarding $75,000.00 in compensatory damages for paralysis ranging from the plaintiff's shoulder to his hand). Thus, if Mr. Rhyne had been seriously injured during his detainment, he could reasonably have been expected to receive an award in the $100,000.00 range. In that case, Mrs. Rhyne's compensatory damages award would likely have been higher as well (due to increased emotional distress and a possible additional claim for loss of consortium). Accepting compensatory damages of $100,000.00 as representative for the potential harm Mr. Rhyne could have suffered, a ratio of 115:1 still remains. This discrepancy is much greater than the 10:1 ratio upheld in *TXO*. Finally, as to the issue of authorized or imposed sanctions for comparable misconduct, K-Mart was certainly guided by section 1D-25(b) in believing any potential liability for egregiously wrongful acts involving fraud, malice, or willful or wanton conduct would be limited to the greater of $250,000.00 or three times compensatory damages awarded against K-Mart.

While K-Mart's conduct reached a high level of reprehensibility, the punitive damages awarded in this case exceeded the reasonable relationship that is required between such an award and actual or potential harm to plaintiffs, *see Gore*, 517 U.S. at 580, 134 L. Ed. 2d at 829, and thus went beyond what was needed to achieve the State's goal of punishment and deterrence. As section 1D-25(b) further promised to set a maximum for punitive damages, K-Mart did not have fair notice of a penalty as severe as the one imposed in this case.

I would therefore hold the punitive damages award of $23 million in this case to be excessive because it transcends the constitutional limits of the federal Due Process Clause. Accordingly, I would vacate the award and remand this matter to the trial court for the entry of an appropriate remedy. *See id.* at 586, 134 L. Ed. 2d at 833.

*Summary*

In summary, I would hold section 1D-25(b) both unconstitutionally overbroad in that the limitation it imposes on punitive damages impermissibly infringes on a party's constitutional right to a jury trial on the determination of punitive damages for causes of action recognized prior to April 1868 and in violation of article I, section 19 of the North Carolina Constitution.[7] Invalidating the statute would necessitate the reinstatement of the jury's original $23 million punitive damages award. As this award, however, is grossly excessive under the federal Due Process Clause, I would vacate the original punitive damages award and remand this case to the trial court for the entry of an appropriate remedy.

---

7. Accordingly, I do not address the proper application of section 1D-25(b) as the majority does in section II of its opinion.